## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ROBERT STEPHENSON,

      Plaintiff,

v.

UNIVERSITY OF MICHIGAN, UNIVERSITY
OF MICHIGAN BOARD OF REGENTS, and
LAURIE MCCAULEY, University of Michigan
Provost and Executive Vice President for
Academic Affairs, PATRICIA HURN, Dean of
the University of Michigan School of Nursing,
and ROBERT PLOUTZ-SNYDER, Assistant
Dean of Research and Scholarship for the
University of Michigan School of Nursing, *sued
in their personal and official capacities*,

      Defendants.

Case No.

Hon.

---

David A. Nacht (P47034)
NACHTLAW, P.C.
*Attorneys for Plaintiff*
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dnacht@nachtlaw.com

---

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff ROBERT STEPHENSON ("Plaintiff"), by and
through his attorneys, NACHTLAW, P.C., and hereby alleges as follows:

### INTRODUCTION

1.    Plaintiff is an expert in sexual and reproductive health and one of the
world's foremost authorities on intimate partner violence in the LGBT community.

2.     Plaintiff's claims arise out of the discriminatory and retaliatory treatment he faced while employed as a professor at the University of Michigan ("UM") School of Nursing, and the wholly inadequate process he was afforded prior to being deprived of his constitutionally protected liberty and property interests in his work.

3.     Plaintiff brings this action against Defendants for violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq.* ("Title IX"), and violation the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. 37.2201 *et seq.*

## CLAIM, JURISDICTION, AND PARTIES

4.     Plaintiff Robert Stephenson, is a gay man, a resident of Ann Arbor, Michigan, and a Professor of Nursing at the UM School of Nursing.

5.     Defendant University of Michigan is a publicly funded and state-operated university located in Ann Arbor, Michigan. UM receives state and federal funding for the provision of higher education.

6.     Defendant University of Michigan Board of Regents is the publicly elected governing body of UM.

7.     Defendant Laurie McCauley is the UM Provost and Executive Vice President for Academic Affairs. As such, she oversees and is responsible for the

investigatory and disciplinary processes Plaintiff was subjected to. She is sued in her personal and official capacities.

8.     Defendant Patricia Hurn is the Dean of the UM School of Nursing. She is sued in her personal and official capacities.

9.     Defendant Robert Ploutz-Snyder is the Assistant Dean of Research and Scholarship for the UM School of Nursing. He is sued in his personal and official capacities.

10.    The events underlying this Complaint occurred in Ann Arbor, Michigan, within the Eastern District of Michigan.

11.    This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, as well as supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## FACTUAL ALLEGATIONS

### Plaintiff's Background

12.    Plaintiff was born in 1974 in the United Kingdom, the youngest child in a very poor household.

13.    At the age of 17, Plaintiff suffered a severe and traumatizing rape.

14.    Despite this setback, Plaintiff did not allow the terrible experience to stop him from pursuing his goals, instead using it as inspiration and motivation to help other victims of sexual violence.

3

15.     As a result, Plaintiff became the first person in his family to attend college, working three jobs to pay his way and ultimately earning five degrees: a Bachelor of Science in Social Statistics from the University of Southampton in the United Kingdom in 1995, a Master of Science in Medical Demography and a Diploma in Tropical Medicine from the London School of Hygiene and Tropical Medicine in the United Kingdom in 1996, a Ph.D. in Demography from the University of Southampton in the United Kingdom in 1999, and a Master of Arts in Photography from Savannah College of Art and Design in the United States in 2017.

16.     As a result of this education, Plaintiff is trained as a demographer and epidemiologist.

17.     After receiving his PhD, Plaintiff emigrated to the United States as a post-doctoral fellow in 2001, working at institutions in North Carolina, Maryland, and Georgia before coming to UM in 2015.

18.     For more than 20 years, Plaintiff has worked tirelessly to build a career focused on creating quality science that improves the sexual and reproductive health of vulnerable populations around the world.

19.     The interventions he has developed to help improve sexual health are now used globally and are endorsed by the Centers for Disease Control and Prevention as best practice.

4

20.    Much of Plaintiff's work involves research and, until recently, he was lead or co-lead on ten grants from the National Institutes of Health ("NIH").

21.    This research is centered primarily on the development and testing of interventions that aim to improve sexual health outcomes, with a particular focus on HIV prevention among sexual and gender minority populations in the US and globally.

22.    In addition to his work with sexual and gender minority groups, Plaintiff also has a multi-decade history of work in women's sexual and reproductive health, with a specific focus on family planning and maternal health issues in resource-poor countries, examining how climates of gender inequity put women at risk for poor reproductive health outcomes.

23.    Plaintiff has worked with governments all over the world - from Afghanistan to Zambia - to help improve the sexual and reproductive health of their female citizens.

### Plaintiff's Employment at the University of Michigan

24.    Plaintiff was hired as a professor in the Department of Health Behavior & Biological Sciences at the UM School of Nursing in January of 2015.

25.    Upon his hire, Plaintiff also became Co-Director of the Center for Sexuality and Health Disparities ("CSHD"), a grant-funded research center based in

the School of Nursing that focuses on research related to the sexual and reproductive health of vulnerable populations globally.

26.    CSHD's work, much of which focuses on HIV risk and prevention in sexual and gender minority communities, is fully funded through external grants rather than UM general funds.

27.    Plaintiff's co-director was Dr. Jose Bauermeister, who at the time was also a faculty member at the School of Public Health.

28.    Dr. Bauermeister left UM in 2017, at which point Plaintiff took over as sole Director of CSHD.

29.    In 2018, Plaintiff was appointed Chair of the Department of Systems, Populations and Leadership, replacing Dr. Marita Titler.

30.    As Plaintiff's star rose at UM, however, it became progressively clear that Defendant Hurn viewed him differently from his heterosexual peers.

31.    Defendant Hurn treated Plaintiff increasingly coldly and condescendingly throughout his time on the faculty, repeatedly taking underhanded jabs at his sexuality by referring to him and other gay staff members as too "soft" and "sensitive" and telling Plaintiff that her father would never approve of a "man like him."

32.     Unfortunately, over the course of his time at UM, Plaintiff also faced sexual harassment, abuse, and retaliation at the hands of a graduate student, Complainant A, and a staff member, Complainant B.

33.     Until he met these individuals, Plaintiff had never been the subject of any complaint of improper behavior whatsoever, or even the slightest suggestion thereof.

34.     In fact, Plaintiff is routinely sought out as a mentor for students from around the world and has won national and international awards for mentorship.

35.     Defendant Hurn's homophobia led her to take advantage of the abuse and retaliation Plaintiff suffered, seizing on these false accusations and continuing to weaponize them against Plaintiff even after Defendants' own Hearing Officer cleared him of responsibility for the policy violations he had been accused of.

**Plaintiff's Contacts with Complainant A**

36.     Complainant A was a student in the UM School of Nursing Ph.D. program between 2015 and 2019.

37.     Plaintiff was his doctoral advisor.

38.     Complainant A also began working as a CSHD staff member in 2015.

39.     Within a month of starting work at CSHD, Complainant A began a sexual relationship with a student, which Plaintiff reported to HR.

40.     Over the course of Complainant A's work at CSHD, Plaintiff heard him make multiple racist remarks and ultimately reported him to HR for racism on two occasions.

41.     In 2015, Plaintiff and Complainant A traveled to Atlanta together to attend meetings at Emory University, and Complainant A stayed on after Plaintiff left.

42.     The next week, Plaintiff was contacted by faculty at Emory who stated that Complainant A had made sexual advances to two staff there and asked Plaintiff not to bring him back to the school.

43.     In 2017, Plaintiff and Complainant A travelled to Geneva for a World Health Organization meeting; afterwards a senior staff member complained to Plaintiff that Complainant A had made inappropriate comments to junior male staff.

44.     In early 2016, Complainant A sent Plaintiff a friend request on Snapchat.

45.     In April of 2016, via Snapchat, Plaintiff mentioned an error that Complainant had made at work, and Complainant A responded by suggesting that Plaintiff "spank" him for it.

46.     At first, Plaintiff took Complainant A's sexual remarks as jokes and brushed them aside, simply joking back in a non-sexual manner.

8

47.     Aware of Plaintiff's emotional and psychological vulnerability as a survivor of sexual assault, however, Complainant A proceeded to sexually threaten and menace Plaintiff, telling Plaintiff that he "had" him now and taunting him with the sexual behaviors he intended to coerce Plaintiff into.

48.     Plaintiff attempted to report Complainant A's harassment to Defendant Hurn, but she brushed him off, making it clear to Plaintiff that in her view, graduate students were not capable of sexually harassing professors.

49.     As a result, Plaintiff felt trapped as the treatment escalated; Complainant A's behavior was surpassing what Plaintiff could handle as a survivor of sexual assault, but he felt powerless to do anything about it.

50.     Between 2016 and 2019, Complainant A made numerous threatening and controlling statements to Plaintiff, ultimately leaving Plaintiff in a constant state of fear.

51.     During this period, Complainant A also began sending Plaintiff Digital Touch messages depicting graphic, sexually explicit comments, and drawings of what he wanted himself and Plaintiff to do together, none of which Plaintiff responded to.

52.     When Plaintiff asked Complainant A to stop sending these messages, Complainant A replied, "it stops when I say so."

9

53.     During this period, Complainant A texted Plaintiff, "you know one day I could rape you."

54.     During this period, Complainant A sent Plaintiff numerous additional sexually explicit, inappropriate, and offensive messages, images, and videos, and subjected him to multiple sexually menacing encounters.

55.     After 2019, to Plaintiff's immense relief, his contacts with Complainant A again became cordial and professional; Plaintiff and Complainant A worked on two papers and wrote a grant together, which was ultimately not submitted.

56.     In February of 2022, Plaintiff met again with Complainant A, who was by then an Assistant Professor at the University of Miami, to discuss submitting the grant they had written.

57.     Complainant A demanded that he be made the lead, but Plaintiff refused because the proposal was based on Plaintiff's idea and research.

**Plaintiff's Contacts with Complainant B**

58.     Complainant B met Plaintiff in 2017 when he began working in CSHD as a research assistant while enrolled in the Master of Public Health program at UM.

59.     After graduation, Complainant B was employed by CSHD as a research associate.

60.     From the very beginning of his association with CSHD, Complainant B alleged – contrary to evidence – that he was being paid less based on his age and

race, even filing a complaint with the UM Office of Equity, Civil Rights, and Title IX ("ECRT") which was found to be completely baseless.

61.     Soon after becoming a CSHD staff member, Complainant B began to sexually harass Plaintiff.

62.     When Plaintiff took him to lunch to discuss Complainant B's career, as Plaintiff did for all his staff, Complainant B touched him inappropriately and asked if they could watch pornography together.

63.     Thereafter, Complainant B continued to sexually harass Plaintiff, telling Plaintiff about his rape fantasies, touching him inappropriately on multiple additional occasions, sending him numerous inappropriate gifts, and coming to Plaintiff's home and taking photos of Plaintiff without his permission.

64.     Complainant B's harassment combined with the immense amount of trauma Plaintiff had previously faced in his life triggered a state of extreme anxiety and psychological paralysis that prevented him from reporting what he was going through, particularly given that Defendant Hurn had already made it clear to Plaintiff that she did not consider individuals in Complainant B's position capable of sexually harassing professors.

65.     Plaintiff eventually cut off all contact with Complainant B except what was strictly necessary for his work.

**Defendants' Discriminatory and Retaliatory Disciplinary Proceedings Against Plaintiff**

66.     On March 21, 2022, Plaintiff received a Notice of Investigation from ECRT informing him that he was being investigated for allegedly violating the UM Policy on Sexual and Gender-Based Misconduct ("SGBM") with regard to Complainant B.

67.     On March 30, 2022, Plaintiff received an updated Notice of Investigation from ECRT informing him that he was being investigated for allegedly violating the SGBM policy with regard to both Complainant A and Complainant B.

68.     Complainant A's accusations were added just weeks after Plaintiff refused to cede his role as lead on their grant proposal based on Plaintiff's work.

69.     Between April 20, 2022, and May 18, 2022, ECRT interviewed fourteen witnesses, including Plaintiff and both Complainants, and on July 18, 2022, Plaintiff received a Preliminary Investigation Report containing a summary of the evidence ECRT had received.

70.     After all parties were given the opportunity to review and provide feedback on the Preliminary Investigation Report, a Final Investigation Report was issued on September 7, 2022.

71.     A hearing took place via videoconference on October 10, 11, and 19, 2022.

72.     Just prior to the release of the Hearing Officer's decision, Plaintiff had a meeting with Defendant Hurn, during which she informed him she had seen the results of the investigation, that he had lost the hearing, and that he had no choice but to resign and "go back to where he came from."

73.     Immediately thereafter, on December 2, 2022, the Hearing Officer issued written decisions finding that Plaintiff had not violated the SGBM policy regarding either Complainant.

74.     Over the course of this process, Plaintiff learned that the proceedings against him had been triggered not by Complainant A or B, but by a third-party report to ECRT.

**Defendant Hurn Punishes Plaintiff Before Any Finding Against Him**

75.     During the pendency of the investigation against Plaintiff, he was ostracized by the UM administration and removed from his positions as Director of CSHD and Chair of the Department of Systems, Populations and Leadership.

76.     During the pendency of the investigation against Plaintiff, Defendant Hurn repeatedly threatened Plaintiff, informing him that she would ruin his career and reputation and instructing him not to return to campus.

77.     When the female and heterosexual Dr. Titler was replaced by Plaintiff as department chair in 2018, she was celebrated with flowers and a public thanks by way of a glowing email despite her history of violent behavior.

13

78.     By contrast, when Defendant Hurn removed Plaintiff from the same position, she sent a curt email stating that Plaintiff was "no longer Chair," fomenting rumors and suspicion, and replaced him with a heterosexual colleague whom she herself had called "underqualified."

79.     Despite having cautioned Plaintiff in the past to protect the privacy of a heterosexual female colleague who was found *responsible* for racism by ECRT, Defendant Hurn categorically refused to do anything to protect Plaintiff's privacy during the investigation whatsoever, even when directly asked to do so by Plaintiff and even after the Hearing Officer found in his favor.

**Defendants' Continued Discrimination and Retaliation Against Plaintiff**

80.     After the Hearing Officer found that Plaintiff had not violated the SGBM policy, Defendant Hurn lied to Plaintiff repeatedly in meetings, attempting to force him into resigning; in recorded conversations, Defendant Hurn mischaracterized the outcome of the investigation of Plaintiff, lied about having seen all the relevant evidence, lied about UM policy, and threatened to ruin Plaintiff's reputation.

81.     In January of 2023, Plaintiff had another meeting with Defendant Hurn, during which she told him that the appeal of the Hearing Officer's finding was completed, she had read the report, and Plaintiff had lost; that they were

adding criminal charges against him; that UM would be firing him within the month; that he was disgusting; and that she would ruin his career.

82.     There is a 10-year term limit on being a Dean at UM, and Defendant Hurn is currently approaching the end of her tenure and applying for new positions.

83.     As such, she has put her own interests and reputation before Plaintiff's rights, attempting to remove him from UM as quickly and quietly as possible rather than attempting to determine whether the accusations against him have any merit whatsoever.

84.     Despite the Hearing Officer's determination that Plaintiff was not responsible for the policy violations he was accused of, Plaintiff's ostracization on campus continued unabated.

85.     In March and April of 2023, Plaintiff began to hear second-hand reports that his NIH funding was on hold and that colleagues at other institutions were being informed of the accusations against him and told that Defendants were in the process of removing Plaintiff as Principal Investigator ("PI") on his relevant NIH grants.

**Plaintiff Complains to ECRT about Sexual Orientation Discrimination and Retaliation; Nonetheless, the Discrimination and Retaliation Continues**

86.     On April 10, 2023, Plaintiff contacted ECRT regarding Defendant Hurn, outlining her ongoing discrimination and retaliation against him.

87.     ECRT informed the Provost's office of Plaintiff's complaint.

88.     Plaintiff eventually learned that despite being cleared of responsibility by the Hearing Officer, NIH had nonetheless been informed of the accusations against him and commenced an investigation.

89.     Although no notification was sent to Plaintiff, he also eventually learned that NIH had frozen all his grant funding as of April 13, 2023.

90.     Plaintiff also eventually learned that a number of Plaintiff's colleagues in the School of Nursing, including Defendant Ploutz-Snyder, were reaching out to his collaborators at other schools and verbally informing them that he was to be permanently removed as a researcher on his NIH grants and that new PIs would need to be identified immediately.

91.     Defendant Ploutz-Snyder was apparently seizing on this opportunity to retaliate against Plaintiff based on existing resentments.

92.     In 2018, Defendant Ploutz-Snyder had attempted to move from the research track to the tenure track at UM.

93.     After Defendant Hurn told Plaintiff she didn't believe Defendant Ploutz-Snyder was up to the task, Plaintiff had reviewed his resume and told him he wasn't qualified for tenure and as Chair, Plaintiff would not support it.

94.     On April 19, 2023, after becoming a candidate for the role of Chair of the Department of International Health at the Johns Hopkins Bloomberg School of

Public Health, Plaintiff received a notification from the school's Office of Institutional Equity informing him that it had been notified of the allegations against him despite the finding in his favor, seriously crippling his chances of obtaining this new position.

95.     Defendant Ploutz-Snyder continued contacting Plaintiff's collaborators in early May, refusing to put anything substantive in writing and setting up Zoom calls instead.

96.     For example, Defendant Ploutz-Snyder informed Dr. Patrick Sullivan of Emory University, Plaintiff's collaborator of 20 years, that NIH had completed an investigation of Plaintiff, that all his NIH funding would be pulled permanently, that NIH and UM had communicated this to Plaintiff extensively, and that Plaintiff was lying if he said otherwise.

97.     Crucially, Defendants began instructing Plaintiff's collaborators to identify new PIs for the relevant research *before* the decision of the external reviewer on appeal, which allegedly took place on May 5, 2023.

98.     On May 23, 2023, after Plaintiff's collaborators at other institutions had uniformly decided to end their subcontracts with UM rather than allow Plaintiff to be replaced as PI on the relevant grants, Defendant Ploutz-Snyder met with the interim director of CSHD, Dr. Erin Kahle, and asked her to contact the relevant

Case 2:23-cv-11876-MAG-KGA   ECF No. 1, PageID.18   Filed 08/02/23   Page 18 of 35

institutions and persuade them to keep the subcontracts and allow Plaintiff to be replaced.

99.    Dr. Kahle refused to do so.

100.    Around the same time, Defendant Ploutz-Snyder also attempted to convince other UM faculty members, including Yasamin Kusunoki, to replace Plaintiff as PI on grants they had been working on together.

101.    Plaintiff's collaborators uniformly refused to allow him to be replaced on the relevant grants until explicitly instructed to do so by NIH.

102.    Plaintiff was ultimately replaced as PI on the relevant grants by heterosexual women, despite the presence of other qualified gay male faculty members.

**UM Retaliates Against Plaintiff for Complaining to ECRT**

103.    On May 11, 2023, Plaintiff received a text message and letter from Defendant Hurn informing him that he was being placed on paid administrative leave because pursuant to ECRT's appeal process, the external reviewer had reversed the decisions of the Hearing Officer and remanded both matters back to ECRT for additional investigation.

104.    No good reason or new facts emerged to justify placing Plaintiff on administrative leave.

18

105.   Defendants did so directly in retaliation for Plaintiff contacting ECRT to report concerns about Defendant Hurn.

106.   The unwarranted placement of Plaintiff on administrative leave without any finding that he had engaged in sexual harassment had two critical negative outcomes.

107.   First, the administrative leave lent credence to the false allegations, resulting in news stories in the Michigan Daily and Detroit News that significantly damaged Plaintiff's reputation and career.

108.   Second, Plaintiff lost access to work emails which directly affected his reputation and ability to search for alternate employment and, at the time of this complaint, prevented him from accessing materials needed to prove his claims and defend himself before ECRT.

109.   Defendants destroyed this important evidence in flagrant disregard of the litigation hold notice to preserve all relevant documents sent to UM Senior Associate General Counsel Gloria Hage by the undersigned counsel on January 25, 2023, confirmed by Ms. Hage in writing the same day, and again on April 27, 2023, confirmed by Ms. Hage in writing on May 4, 2023.

110.   Defendants' actions have caused Plaintiff irreparable harm and compromised his ability to prosecute this lawsuit.

111.   Not only has Plaintiff lost NIH funding, wages, and professional appointments, but also the respect of his colleagues worldwide.

112.   Despite his decades of pivotal academic work, Plaintiff's credibility has taken a hit that will likely never be fully repaired.

113.   Had Plaintiff been afforded proper procedural due process protections and treated with the proper respect and dignity afforded to Title IX complainants, his career would be intact.

**COUNT I**
**Violation of the Due Process Clause of the**
**Fourteenth Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**
*(against the individual defendants for money damages in their personal capacities*
*and injunctive relief in their official capacities)*

114.   Plaintiff incorporates the preceding allegations as if fully restated herein.

115.   The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall… deprive any person of life, liberty, or property, without due process of law."

116.   42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of law.

117.   Plaintiff engaged in protected activity by opposing the discrimination he faced at work and filing a grievance against Defendant Hurn with ECRT based on the discriminatory and retaliatory treatment she subjected him to.

118.   Defendants acted under color of law when they engaged in the conduct described herein, including, but not limited to, removing Plaintiff from his positions as Chair of the Department of Systems, Populations and Leadership and Director of CSHD, placing him on administrative leave, facilitating the freezing of his federal research funding and his removal as PI on the associated grants, and destroying important email evidence supporting Plaintiff's claims.

119.   Plaintiff had a constitutionally protected property interest in his positions as Chair of the Department of Systems, Populations and Leadership, Director of CSHD, and PI on his NIH research grants because of the importance of these positions to his scholarship and standing in the academic community, *see Smock v. Bd. of Regents of Univ. of Michigan*, 353 F. Supp. 3d 651, 657 (E.D. Mich. 2018) (citing *Sharp v. Lindsey*, 285 F.3d 479, 489 (6th Cir. 2002)); *see also Gunasekera v. Irwin*, 551 F.3d 461, 471 (6th Cir. 2009).

120.   Because the reputational stigma Defendants fostered against Plaintiff is related to his demotion, he also had a constitutionally protected liberty interest in his good name and reputation, *see Murtha v. Rossford Exempted Vill. Sch.*, No. 21-3449, 2021 WL 4950238, at *5 (6th Cir. Oct. 25, 2021).

121. Although Defendants had provided Plaintiff with notice of the allegations against him and the opportunity to be heard and question his accusers, when these procedures resulted in a finding in Plaintiff's favor, Defendants deprived him of the above-listed property and liberty interests anyway, without any procedural basis whatsoever.

122. It is "well-settled" for purposes of § 1983 that Plaintiff's constitutionally protected liberty interest in his "reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment." *Gallow v. Pittis*, No. 2:17-CV-1007, 2019 WL 4192717, at *4 (S.D. Ohio Sept. 4, 2019) (citing *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002)).

123. Accordingly, Defendants' actions outlined *supra* violated Plaintiff's clearly established constitutional rights, of which any reasonable person in their position would have known; they are therefore not entitled to qualified immunity.

124. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, removal from his positions at UM; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

125.   Plaintiff is entitled to punitive damages because Defendants engaged in the above-described conduct with malicious and evil intent, in callous disregard of Plaintiff's federally protected rights.

## COUNT II
### Violation of the Equal Protection Clause of the
### Fourteenth Amendment to the U.S. Constitution
### 42 U.S.C. § 1983
*(against the individual defendants for money damages in their personal capacities and injunctive relief in their official capacities)*

126.   Plaintiff incorporates the preceding allegations as if fully restated herein.

127.   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall… deny to any person within its jurisdiction the equal protection of the laws."

128.   42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of law.

129.   Defendants acted under color of law when they engaged in the conduct described herein, including, but not limited to, removing Plaintiff from his positions as Chair of the Department of Systems, Populations and Leadership and Director of CSHD, placing him on administrative leave, facilitating the freezing of his federal research funding and his removal as PI on the associated grants, and destroying important email evidence supporting Plaintiff's claims.

23

130.   Defendants' actions were motivated by homophobic discrimination on the basis of Plaintiff's sex.

131.   Defendants thereby violated Plaintiff's clearly established constitutional right to equal protection of the laws, of which any reasonable person in their position would have known; they are therefore not entitled to qualified immunity.

132.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, removal from his positions at UM; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

133.   Plaintiff is entitled to punitive damages because Defendants engaged in the above-described conduct with malicious and evil intent, in callous disregard of Plaintiff's federally protected rights.

**COUNT III**
**Sex Discrimination in Violation of Title IX**
**20 U.S.C. § 1681 *et. seq*.**
*(against Defendants University of Michigan and the University of Michigan Board of Regents)*

134.   Plaintiff repeats and realleges the paragraphs set forth above with the same force and effect as though set forth in full herein.

135.   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

136.   Discrimination on the basis of sexual orientation constitutes prohibited sex discrimination under federal law, *see Bostock v. Clayton Cnty., Georgia*, 207 L. Ed. 2d 218, 140 S. Ct. 1731 (2020).

137.   Defendants University of Michigan and the University of Michigan Board of Regents are institutions receiving Federal financial assistance.

138.   After Defendants' homophobic attempts to use the abuse and harassment Plaintiff suffered at the hands of Complainants A and B and their false accusations against him to eject Plaintiff from UM hit a roadblock when the Hearing Officer found in his favor, Defendants simply switched tactics, informing NIH of the false allegations against Plaintiff, and facilitating the freezing of his research funding and his removal as PI from all applicable grants.

139.   Plaintiff was qualified for his positions as Chair of the Department of Systems, Populations and Leadership, Director of CSHD, and PI on his NIH research grants.

140.   Defendants subjected Plaintiff to intentional discrimination including, but not limited to, by making and/or permitting discriminatory statements, showing

preference for heterosexual professors in the terms and conditions of employment, removing Plaintiff as Chair of the Department of Systems, Populations and Leadership and Director of CSHD, placing him on administrative leave, and facilitating the freezing of his research funding and his removal as PI on the associated grants while holding heterosexual professors to significantly more lenient standards.

141.   Defendants applied their policies and procedures in a manner that discriminated against Plaintiff on the basis of sex, causing him serious and unjustified damage.

142.   Defendants treated Plaintiff less favorably than other comparable Nursing professors who were heterosexual.

143.   Sex-based sexual orientation bias was a motivating factor behind Defendants' commencement of disciplinary proceedings against Plaintiff and their ongoing attempts to block him from continuing his work despite the Hearing Officer's finding that the accusations against him were not substantiated.

144.   Based on the foregoing, Plaintiff was subjected to biased, prejudiced, and unfair treatment in violation of Title IX, motivated by a desire to punish him for his sexual orientation.

145.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not

limited to, removal from his positions at UM; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT IV
### Retaliation in Violation of Title IX
### 20 U.S.C. § 1681 *et. seq.*
*(against Defendants University of Michigan and the University of Michigan Board of Regents)*

146.   Plaintiff incorporates the preceding allegations as if fully restated herein.

147.   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

148.   Discrimination on the basis of sexual orientation constitutes prohibited sex discrimination under federal law, *see Bostock*, 140 S. Ct. at 1731.

149.   Plaintiff engaged in protected activity by opposing the discrimination he faced at work and filing a grievance against Defendant Hurn with ECRT based on the discriminatory and retaliatory treatment she subjected him to.

150.   Defendants were aware of Plaintiff's protected activity.

151.   Defendants subjected Plaintiff to adverse employment actions in retaliation for his protected activity, including, but not limited to, by placing him on

administrative leave and facilitating the freezing of his research funding and his removal as PI on the associated grants.

152.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, removal from his positions at UM; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**COUNT V**
**Sex Discrimination in Violation of ELCRA**
**M.C.L. 37.2201 *et seq*.**
*(against Defendants University of Michigan and the University of Michigan Board of Regents)*

153.   Plaintiff incorporates the preceding allegations as if fully restated herein.

154.   At all relevant times, Plaintiff was an employee and Defendants were employers as defined by ELCRA.

155.   The State of Michigan has waived its Eleventh Amendment sovereign immunity and consented to suit under ELCRA on behalf of Defendants University of Michigan and the University of Michigan Board of Regents, which are arms of the state.

156. Discrimination on the basis of sexual orientation constitutes prohibited sex discrimination under ELCRA, *see Rouch World, LLC v. Dep't of C.R.,* 510 Mich. 398, 421–22, 987 N.W.2d 501, 513 (2022).

157. Plaintiff is a member of a protected class based on his sexuality.

158. Plaintiff was qualified for his positions as Chair of the Department of Systems, Populations and Leadership, Director of CSHD, and PI on his NIH research grants.

159. Defendants subjected Plaintiff to intentional discrimination including, but not limited to, by making and/or permitting discriminatory statements, showing preference for heterosexual professors in the terms and conditions of employment, removing Plaintiff as Chair of the Department of Systems, Populations and Leadership and Director of CSHD, placing him on administrative leave, and facilitating the freezing of his research funding and his removal as PI on the associated grants while holding heterosexual professors to significantly more lenient standards.

160. Defendants treated Plaintiff less favorably than other comparable Nursing professors who were not members of Plaintiff's protected class.

161. But for Plaintiff's sexuality, Defendants would not have taken adverse employment actions against him.

162. Defendants acted willfully.

163.   Sexual orientation bias was a motivating factor behind Defendants' commencement of disciplinary proceedings against Plaintiff and their ongoing attempts to block him from continuing his work after the Hearing Officer found in his favor.

164.   Defendants applied their policies and procedures in a manner that discriminated against Plaintiff on the basis of sex, causing him serious and unjustified damage.

165.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, removal from his positions at UM; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

166.   Plaintiff is entitled to exemplary damages because Defendants engaged in the above-described conduct with malice and reckless indifference to his federally protected rights.

**COUNT VI**
**Retaliation in Violation of ELCRA**
**M.C.L. 37.2201 et seq.**
*(against Defendants University of Michigan and the University of Michigan Board of Regents)*

167.   Plaintiff incorporates the preceding allegations as if fully restated herein.

168.   At all relevant times, Plaintiff was an employee and Defendants were employers defined by ELCRA.

169.   The State of Michigan has waived its Eleventh Amendment sovereign immunity and consented to suit under ELCRA on behalf of Defendants University of Michigan and the University of Michigan Board of Regents, which are arms of the state.

170.   Plaintiff engaged in protected activity by opposing the discrimination he faced at work and filing an ECRT grievance against Defendant Hurn based on the discriminatory and retaliatory treatment she subjected him to.

171.   Defendants were aware of Plaintiff's protected activity.

172.   Defendants subjected Plaintiff to adverse employment actions in retaliation for his protected activity, including, but not limited to, by placing him on administrative leave and facilitating the freezing of his research funding and his removal as PI on the associated grants.

173.   But for Plaintiff's protected activity, Defendants would not have taken adverse employment actions against him.

174.   Defendants acted willfully.

175.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, removal from his positions at UM; loss of income; loss of career

opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

176.   Plaintiff is entitled to exemplary damages because Defendants engaged in the above-described conduct with malice and reckless indifference to his federally protected rights.

## RELIEF REQUESTED

Plaintiff demands judgment against Defendants as follows:

A. Legal Relief:

1.   Compensatory damages in whatever amount he is found to be entitled;

2.   Exemplary damages in whatever amount he is found to be entitled;

3.   Punitive damages in whatever amount he is found to be entitled; and

4.   An award of interest, costs, reasonable attorney fees, and expert witness fees.

B. Equitable Relief:

1.   Reappointment to his position as Chair of the Department of Systems, Population and Leadership;

2.   Reappointment as PI on his former research grants;

3.   Access to the associated federal research funding;

4.   An injunction prohibiting any further acts of wrongdoing or retaliation against Plaintiff;

5. An award of interest, costs and reasonable attorney fees; and

6. Whatever other equitable relief is appropriate at the time of final judgment.

Respectfully Submitted,

NACHTLAW, P.C.
/s/ *David A. Nacht*
David A. Nacht (P47034)
*Attorneys for Plaintiff*
101 N. Main Street, Suite 555
Ann Arbor, MI 48104
(734) 663-7550

Dated: August 2, 2023

## **VERIFICATION**

I declare that the facts stated above in Plaintiff's Complaint are true to the best of my personal knowledge, information and belief.

ROBERT STEPHENSON

Subscribed and sworn to before me this 2nd day of August, 2023

Abigail H. Ohl
Notary Public – State of Michigan
County of Washtenaw
My Commission Expires January 4, 2024
Acting in the County of Washtenaw

33

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ROBERT STEPHENSON,

      Plaintiff,                          Case No.

v.                                     Hon.

UNIVERSITY OF MICHIGAN, UNIVERSITY
OF MICHIGAN BOARD OF REGENTS, and
LAURIE MCCAULEY, University of Michigan
Provost and Executive Vice President for
Academic Affairs, PATRICIA HURN, Dean of
the University of Michigan School of Nursing,
and ROBERT PLOUTZ-SNYDER, Assistant
Dean of Research and Scholarship for the
University of Michigan School of Nursing, *sued
in their personal and official capacities*,

      Defendants.

---

David A. Nacht (P47034)
NACHTLAW, P.C.
*Attorneys for Plaintiff*
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dnacht@nachtlaw.com

---

## <u>JURY DEMAND</u>

NOW COMES Plaintiff ROBERT STEPHENSON, by and through his attorneys, NACHTLAW, P.C., and hereby demands a trial by jury in the above-captioned matter for all issues so triable.

                         `                 Respectfully Submitted,

                                          NACHTLAW, P.C.

/s/ *David A. Nacht*

David A. Nacht (P47034)

*Attorneys for Plaintiff*

101 N. Main Street, Suite 555

Ann Arbor, MI 48104

Dated: August 2, 2023          (734) 663-7550